Brian, your court's back in session. Please be seated. Thank you. Counsel, or counsel, excuse me, clerk, will you please call the next page? 217-0264, Harold Faust v. Kandis Health Good afternoon, court. May it please the court, counsel, good to see you. I've come here with three goals in mind. Number one, to get Ms. Faust her benefits. The commission decision was an abomination, frankly. We have reversible factual error, we have reversible legal error. I laid them out in detail. I apologize for the length of the brief. But for the very reason that the commission decided the other chamber didn't do the central analysis, which is the aggravation of pre-existing condition analysis, the commission didn't correct that in their own decision. What they instead did was they got caught up on your ad hoc ruling that came down between the time of my trial decision and the time of the commission decision. And they concluded, they attempted to perform the neutral list doctrine analysis, but they started out with a finding. They promised their analysis with a finding that everybody performs certain activities the same way through daily activities or through their daily life. So they started with a premise that everybody does all these activities the same, and therefore, that dictated the denial, my client's loss on the case, because there's no way we could prove a deviation. Let me ask you a question. It is a well-recognized theory of recovery that the injury-producing activity does not have to be the sole or the primary cause. It can be compensable if it is a cause and factor. Correct. But as I look at here, though, it appears that Dr. Levin opined that lower back problems and work activities did not aggravate or accelerate the preexisting condition. So he seemed to ostensibly rule out the aggravation theory. Is that what he testified to? No. Actually, he had no idea my client was bending, so he didn't premise any of his opinions on the causation on the bending component of the accident, which is what gave rise to the damage to the back. Can I ask you a question? Yes, sir. Dr. Pop's opinion was that the repetitive bending was the mechanism that aggravated a preexisting disc. Correct. The manifestation date was September 1st, and she testified that she didn't begin bending until the beginning of September. So how can it be the cause of it if it didn't happen until after the manifestation date? I thought that she had actually gone into the end of trouble. She was actually helping out the doctors on the database in July, and it ran up through September. She was sitting at a desk, she testified, for the first six months or eight weeks, whatever it was, and Mrs. Wagner testified that the duties of bending never began until early September. Your client said they began at the end of August. So if September 1st is the manifestation date and the end of August is the date she started bending, that occurs to me we've got a little problem on our hands here. Repetitive bending dates of accident are inefficient in the first place. We go with what we have. The only contested testimony in the case, Judge, was 60% of the job involved bending. The only contested testimony from the doctor who actually knew what she did and observed her change in duties between the two positions. When she moved into the epic job, he knew she was bending for that job to train the physicians. So he caused it related to that bending, and he explained from a mechanical standpoint how that would happen. Furthermore, Dr. Levin, who didn't know about the bending, still introduced an authoritative research paper, which actually had two pieces of research in it, which correlated dose-response bending to worsening of a back condition or chronic back disability. So we have a doctor who had personal knowledge of what happened in the case, who knew how the job had changed. He was able to mechanically explain how the bending gave rise to the damage to the back and to the need for treatment. We have research supporting that, and we have a doctor on the other side who didn't know she was bending. So he didn't offer any probative causation. So did you say the commission concluded that this was – the commission essentially used a neutral risk analysis. Is that where they went off the track here? Correct, yes, sir. And if I can explain that. I've thought a lot about this. I've read all the cases, and I've gone back to 1970 to read case law. I don't know how the Adcock ruling can be valid, and let me explain why. In Adcock, he explained to us that if someone's engaged in everyday activity, okay, compensation shouldn't normally be available for that kind of activity unless we can prove an enhancement, either quantitatively or qualitatively, right? The reason quantitatively can't possibly be a touchstone for benefits is that there are no known normative bending averages. In my case, bending. Okay, there are no known normative bending averages for the population. We're talking about the general public, which you in Illinois Institute of Technology defined as not the neighborhood, not the local area, but citywide and perhaps statewide. If I have to fund a study for every case that comes in with a person who's bending or doing certain activities at work, and I have a 100-person sample study – I'm not going to study the entire state, of course. I have a 100-person sample study. I have to pay an agonist to do the measurements. And even if I limit that study to a 24-hour period per sample or per person, that's still a $120,000 study before they crunch the numbers and come up with the bending averages. So the cost of admission to the commission and requiring us to go out and conduct studies to find bending averages, which we can compare our client's movement to, is prohibited. It knocks us out. There's no way we can get access to our benefits. So you're assuming that study has to be done with people doing the exact same thing. Absolutely. Where did you get that idea? Because otherwise it would be arbitrary, right? No, I don't know that it would, but where did you get that idea? The way I got the idea is because I'm thinking of finding – I'm comparing my client's movements to movements of the general public. Well, you're required to simply find out what are normal everyday – okay, if it's a normal everyday activity. Yeah. Okay. Then there should be something out there that suggests for normal everyday activity, how often do people bend or stoop? Not in your job there, but in the general public. That's what I was saying. There are no known normative bending averages in the population. You're sure? I'm pretty sure. Now you're pretty sure. Okay, but I guess what I'm saying, a lawyer's supposed to make a case and get evidence. When did we take that away from them? Okay, let's say we go less than $120,000. I'm sure kinesiologists study these things. Kinesiologists study movements and whether or not they can result in a particular consequence, right? Ergonomists look at your job site and say, is there something more comfortable for you? Epidemiologists study occupational types and compare them to illnesses and injuries and try and find correlations. None of these people, as a matter of practice, determine what bending averages are for the population. Well, surely it's out there, isn't it? It's not. You're pretty sure. I'm asking how much research have you done in this? I googled it. But let me go beyond that. Let's say that, okay, there are some magic averages out there, because bending can be done in so many different ways. So let's say that we have a whole set of studies involving all sorts of bending to the right to the left of the site. I saw you reading witnesses. Your test requires you to purchase expert testimony to come and tell me. We do it all the time. We've got a whole list of doctors, one side, one side, the other, the whole thing.  In fact, lawyers might retire and become those experts. Possibly. But here's where we're going to follow the Constitution. These duties, these rights that these people are trying to protect at the Commission are so fundamental to the fabric of our Constitution, of our civility, that if we're going to make people spend thousands of dollars to bring experts in to establish whatever the averages are based upon, even if there is some information out there, we still have to have perceptible evidence in terms of admissible evidence. But that's in a neutral risk context, though, right? Aren't we talking neutral risk when we go back with averages back and forth and excessive, you know, repetitive? Isn't that confined to neutral risk analysis? Well, I'm talking the outcome specifically, the one where we can't get benefits unless we get your quantitative or qualitative difference. But in this case, if you're proceeding on the aggravation of a preexisting injury, you don't need to go into excessive motions or average, do you? I would like for that to be the case. It was my understanding. I mean, based on what you're alleging here, that this was a causing factor. Of course it was. Absolutely. So you don't need studies. Right. Right? I agree. I agree. My concern is that I see the Noonan case where the guy hurts himself, and I see the McAllister case where the person is holding carrots underneath the, in the cooler. I see the Mitnick case where the guy picking up balls and hurts his back. And I'm thinking, I can't differentiate those logically. And I'm thinking the risk analysis is really not an analysis comparing my movements or my particular activity at the time of the accident to what anyone else is doing. Because risk is a concept inherent to common law liability, the tort cases. Risk gives rise to the foreseeability issue, which gives rise to duty, which gives rise to the potential for liability when we violate the duty. Risk has no role in a workers' compensation system, especially one that's designed to help people out and make sure that they're supported. It's a proximate cause analysis, and they're both theories. The third element to any tort is proximate cause. Proximate cause is the basis for workers' comp liability. They're the same. They're no different. Well, we're talking duty. We're talking risk, foreseeability. We don't care about duty. We don't care about duty. The question is, did it arise out of it or in the course of it? And that's a basis. That's a proximate cause analysis one way or another. My understanding is that duty is inherent, was inherent to the initial construction of the system. It was expected to be a risk in an employment setting that people could get injured. That's why it's a no-fault system. We don't have to go into concepts of fault. We have risk built into the system because it's an inherent part of the case. It's an inherent part of the system. If we're going to start saying, well, is risky as the next job, or was the sous chef doing the chef's job, or how do you compare it to the general public in the way you're moving or the kind of activities you're doing, then we're putting fault back into the system, and we're introducing, again, a risk analysis which just can't be tolerated in the no-fault system. Furthermore, there's this risk. Just positional risk, don't you think that would take care of all of it? Yes. Were you legitimately at the work site when you had your injury? I think that's exactly how it should be. Except we have a problem with that, Mr. Jim. We have the Illinois Supreme Court saying we don't have that doctrine. The Brady v. Ruffalo case, what has become known as the positional risk case, if you look at it closely, we had four justices contributing to that decision. The other three didn't participate for whatever reason. And it turns out in that case that one of the takeaways from the case was that, hey, there was no evidence that this building structure could have been constructed differently to better protect this worker. No early barriers were put up at the location where this bed-in-the-road was located where you could foresee and see something come through. So the analysis, as I understand it, was more, hey, the guy could have brought in evidence that the employer could have done something to protect his employee, even from a vector coming from outside the workplace, into the workplace. So it was really a failure to prove which could have been overcome had he introduced the evidence that there were ways the employer could have protected. I don't think it stands for positional risk. I know it's become known as that. But if you look at the proofs that were poured in and you look at the comments by the Supreme Court, it was really, hey, what would the employer have done? Well, they could have done this, but there's no evidence. I think so you lose your case counsel. What are we supposed to do with the fact that the commission obviously didn't think that your client was quite forthcoming with her prior medical conditions, making a comment that she was, quote, not entirely forthcoming with information regarding her preexisting back condition. She characterized it as impingement, whereas it was actually a multilevel degenerative disc disease documented as early as 2010. And their expert says, wait a minute, this had nothing to do with what she was doing at work. This is all nothing more than the natural consequences of the disc disease she already had. The answer to that is Dr. Levin actually said he thought her condition for her back wasn't the way it was in some parts of her work activities, but he thought she was standing and bent her, standing and sitting, if I recall correctly, not bending. So he did treat it, at least in an aggravation sense, to her work activities. Also, you're asking us to assume that a commission that uses an imaginary accident at the outset of their decision, who ignores evidence from a treating surgeon who actually saw what happened to change her activities, and attributed testimony to, which is the exact opposite of what he testified to, and a commission who couldn't apply the aggravation of preexisting condition doctrine, nor could they apply the neutral risk doctrine, as your candidate down the net got, to be somehow that trumps the legal error, the factual error, the legal error. The other issue I have with the neutral risk doctrine, guys, and I apologize, I didn't mean to call you guys, the other issue I have with the neutral risk doctrine is if we are not accepting a threshold, where my person has to do the movement more than the average public, that means 50% of the population is thrown out of the workers' compensation system by definition, because they won't hit the threshold to be entitled to benefits. Well, that's it, for that activity. For any activity, the way that that doc is written. Quantitatively different. You know, it has to be higher than the average public. It can also be qualitatively different, too. Qualitatively is, in my opinion, nothing more than the traditionally recognized employment risk. Well, I mean, bending over may be different than what this woman described she was required to do. Right. And that's qualitative difference. It occurs to me that because, and the arbitrator seemed to think of it, that by amending the application for adjustment claim, you switch the theory from sitting too long to bending too much. And then, evidently it was observed that she testified she felt much better when she was sitting. Well, which is it? Well, what it is is it's 60% of bending uncontested, not ruled by the supervisor. We have a mechanical explanation. We have research supporting it. We have a defending doctor who doesn't know what she's doing. I win that case. That's a win case. On your issue about the qualitatively different characteristics, again, who says what's qualitatively different from the average general population? I mean, how do I establish that I'm bending in a slightly different way than someone else? It's a standard that can't possibly be met without research studies. And if I have to fund studies to win these cases, when the average case value of 47,000 cases or follow-ups is $2,369 from change, 80% of the case goes away. 80% of the case load goes away. Was the pathology that was noted on the 2013 MRI essentially the same as the pathology that was noted in her 2010 MRI? It was not. It was worse, according to Dr. Popp, Dr. Melvin Pennington Russell. I put this case together so that I could run it through. It's a straightforward case. I got hung up on the ADCA neutral risk doctrine, as you guys handled it down in 2015. I don't know how it can possibly be a valid test, you know, when we're excluding half the population from potential coverage just through a legal doctrine. Well, is it a fair statement that the commission found the claimant's quantitative evidence to be lacking? I think if I'm correct about the neutral risk doctrine, then we can't do the quantitative analysis because it doesn't make any sense. Then it doesn't matter how often she's doing it. The question is, is it causally related? Is it mechanically related to the bending she's doing? The only evidence in the case comes from Dr. Popp, who mechanically relates her bending to her worsening condition and need for treatment. Melvin doesn't address the bending. I will, hopefully. So the neutral risk doctrine, guys, I can't differentiate the pen guy from the ball person or the carrots person. They're all the same to me. And if we're going, and I understand why you think it doesn't make sense. You know, you need to risk higher. I think the risk analysis is wrong. The neutral risk doctrine, I finally went to a daily center library after 27 years of practicing, and I pulled Larson and Kahn. And if you look at his neutral risk section, it's exactly what you guys said in Young and in Illinois Institute of Technology. It's for the outlier cases like the dog bite, lightning strikes, bullets through a window, unknown disabled, crazy disabled, it's that kind of stuff. It's an outlier case. There's no clear employment relationship. Why should the employer be responsible? Okay, well, let's do a neutral risk analysis. Is this something that the employer bought into with the original bargain or not? So not to ask too mundane of a question, so then what happens to the person who just gets hired, the first minute they're on the job, they get out of the chair and they hurt their back? You win. You're doing the job, you win. Absolutely. Why would we hook qualifications into that? They're hired to do the job. They're doing the job. They're not engaging, they're not freebasing. They're not fighting with someone else. They're not doing anything wrong. So that's really positional risk, right? I think that is the touchstone for compensation. I think there is as well, though. Do you think there would be any need for lawyers for that? Well, I think there are lawyers. I think the union representatives in a lot of these areas does that. I get it. I understand. That's a concern for all of us. I get it. I understand. Basically, is it a sanction? You're arguing here specifically this is an aggravation of a pre-existing condition. You should win, but you're also saying throw out the mental risk doctrine as part of the analysis. Is that the ethical way you're saying it? Absolutely, because that's what the commission used to nail me down below. And there will still be defenses. You can still attack causation. You can still attack accident. You can still attack in the course of. You still have all your defenses. There will still be lawyering necessary. What's that? I think there will be lawyering necessary. I'm not badmouthing myself with these arguments. I'll grant you. But the reality is that I don't know how we can go there and start carving exceptions into what you've got to be doing at work before you get COVID. If you're not doing something really bad like doing drugs or fighting with your coworkers or walking around meetings while drinking or something like that, okay, you're outside any reasonable expectation of the employer for that employment setting. That is kind of an assumption of risk. You've blown it. You're out of government coverage. Showing up for work and going in the factory. If you get hurt, but remember, if all you do is get out of the chair, like the County of Crook lady, remember, she stood up, she threw a clot, or developed an aneurysm. What was that case? I mean, that was the case that said, well, you've got to have some connection to work. The problem with that case is a failure of proof again. I don't know the words, because in the studies it was wrong. But what happened in that case? The County of Crook brought in three IMEs and said the aneurysm is not related to a work activity. She didn't bring any pro-causation testimony. That's a pure failure of proof. There's nothing more than that. So you still have to have a connection to the employment, something that if you're walking across the street, I'm walking across the street, there's no defects or anything, I can't explain why I fell unless it's my own fault. In that case, I become my sole proximate cause of the injury. That's the Orsini case. The guy's working on his own thing. He doesn't put the pin in his own brain system. He's doing nothing to benefit the employer. The thing lurches forward and hurts him. It's his fault. There's no contribution from the employer to that injury. He's the sole proximate cause. He loses on the mechanical causation issue. All this stuff is still available. All these defenses are still available. Counsel, you may respond. Good afternoon. Elena Ciancioni for Respondent Kids Health. I apologize. I think I'm that second illegible signature. I think you are, yes. My apologies. Thank you for fessing up early. I take full responsibility. Opposing counsel, I think, is confusing some of the issues in this case. And one of the issues that he did not discuss, I would like to briefly touch on. I know your Honor's asked about it in one of our earlier arguments today. But the standard of review is manifest weight of the evidence. And I think it's important to consider that when we're listening to these arguments today. Because opposing counsel is making arguments about how he thinks workers' compensation law should change. This, frankly, is not the proper venue for that. We are evaluating the Workers' Compensation Commission's factual determinations under the standard of review of whether those were against the manifest weight of the evidence. And specifically, there are two findings that the Commission made in this case that are purely within the province of the Commission to make. And are the deciding factors in this case. First, the Commission found that the petitioner was not credible. And an issue related to a witness' credibility is specifically within the province of the Commission to do so and cannot be disturbed upon review. And second, the Commission decided which medical evidence to adopt, which was more credible. Again, that's an issue that is solely within the province of the Workers' Compensation Commission to determine. Let me ask you this. What about his argument, setting aside neutral risk analysis and ADCOC, that based on Dr. Popp's opinion that the claimant's bending caused aggravation of a preexisting injury? Why is that not a viable theory in this case? It's not because Dr. Popp testified in his transcript that he didn't know how often she bent over. He wasn't – he had watched her. I think he testified that he had watched her perform this work once per period of time. We don't know how long that period of time was. But he testified that he did not use that observation as a basis in his opinion. Well, does it have to be a number of times like in the neutral risk? I mean, I'm trying to weigh these theories. You know, I mean, he's invited us to overrule ADCOC. But the point is, do you have to have the quantitative analysis where somebody – a doctor says that somebody was doing something and that aggravated a preexisting condition? Does it have to be a number of times to accomplish that? It has to be something that causes some aggravation or progression of the injury that would not have occurred otherwise. Correct. But it doesn't have to be a number of times, does it? Correct. Correct. It doesn't have to be a particular number of times. So what's wrong with his theory here? I apologize. No, what's wrong with his theory supported by Popp that, you know, she was doing this and it aggravated her preexisting condition? Well, that goes to the causation decision that the commission made. The commission decided to adopt the findings of Dr. Levin over the findings of Dr. Popp. They did not find Dr. Popp to be credible based on statements that he made in his testimony. But were they analyzing Levin on the basis of the neutral risk factor when they should have looked at a causative factor analysis? I think it wasn't counsel bringing up this neutral risk factor in a way – or I think this is not really the issue, it's confusing the real issue, which is how do these preexisting diseases or preexisting conditions become worse over time? And the issue in this case is that she had a condition that would have been worsened with any activity, not specifically work activities. And that was Dr. Levin's opinion. Dr. Levin's opinion – opposing counsel stated in his oral argument that Dr. Levin's opinion was that the petition's work activities aggravated her condition. That was not what his opinion was. His opinion was that her condition naturally progressed, as it would have, but that maybe her work activities caused her to be symptomatic. But it did not actually progress the issue in her spine. He said that he testified that it did not aggravate or accelerate the condition. Correct. There's a portion in his opinion where Levin says that he looked at the 2010 MRI, he looked at the 2013 MRI, and he observes that the L5-S1 level shows bilateral facet arthritis, degenerative disc changes, and a right-sided L5-S1 disc protrusion, or a herniation that was somewhat improved in comparison to the MRI dated June 30, 2010. Yes. So she didn't get worse, she got better, according to him. Some aspects of her condition did, in fact, get better, so it wasn't a whole-scale regression of her condition. But the commission made two findings in its decision. First, they made a decision on accident. They found that there was no accident. And then they went on to make a finding about causation and said, even if there was an accident, even if you can consider standing, bending, and walking and sitting to constitute an accident, we adopt the opinion of Dr. Levin that it did not cause a regression of her condition, that that would happen regardless of her activities. But this issue with respect to the accident decision came down to a lack of evidence. It's not a mutual risk analysis. It's a lack of evidence analysis. And that's why I think it's important that we talk about the manifest weight standard. Lack of evidence on what issue? On what the accident was. Opposing counsel stated in his brief and also in oral argument that there's uncontested testimony that 60% of the petitioner's job was bending over. That is not what the testimony was. The testimony was that during times when the petitioner was assigned to this secondary training role with physicians, that she estimated 60% of that time was spent bending over. But when she was asked how often were you assigned to that secondary position, she didn't know. She couldn't even estimate. We also have statements made by the petitioner about how many hours she was working, which were directly contradicted. Well, while we're on the topic, how do you respond to the question raised by Justice Hoffman that setting aside some of these theories that she began, I believe, her alleged manifestation date is September 1st, and she began her duties, I believe, at the end of August. And this is where I could testify that I believe it was the beginning of September. So how does that bear on that? It shows that the petitioner is not credible and that these events of sitting, standing, and bending did not cause an aggravation of the petitioner. You're saying of the short period of time between. The issue with what her different activities were really come into play with questioning the credibility of the petitioner. So if you recall, the original application for adjustment of claim that was filed alleged a date of loss of July 1, 2011. And the testimony was that from the end of June 2011 through right about the end of August 2011, her work entailed sitting in a chair and watching lectures to learn this epic computer training program. And then at the end of August for another two months, her work was to actually lecture to physicians in training. And in alleging a different date of loss, she's essentially alleging a different mechanism of accident. So it's unusual compared to, I think, the most, the more common repetitive use claims that we see, because in this case, the petition's repetitive activities that she's alleging actually changed substantially. Counselor. Yes. Initially, you were going down a path that I'd like you to pick up on again, which is I think this is where you were going. If we can completely focus on causation and set aside the rising out of issue in the neutral risk analysis, assuming Levin testified that there was no contributory falls, that the financial work-related activities did not contribute in any fashion. So is that the state of the evidence in regards to Levin's testimony, that nothing about plaintiff's work activities contributed to cause or condition of ill-being? He testified that it did not aggravate or worsen the physical condition in the back. His report did note that it's possible that it made her symptomatic, which is an issue that sometimes we see in workers' comp, where physical activity might make someone hurt because they're feeling the effects of that condition. But the actual spinal condition, the degeneration of the spine, was not furthered in any way by work activities. But the commission also made this decision about the accident based on the petitioner's lack of credibility. The question, she wasn't asymptomatic before she went to work for these people. Correct. She was not. She had visits for low back pain in January, February, March, July, and August of 2011. Yes. And, in fact, she was requesting normal to treat an ongoing chronic back condition in the months before she started working as an epic trainer. Specifically, she was reporting back pain as early as June 2010. She had four lumbar injections between October 2010 and July 2011. One was in January 2011. One was in February 2011. On those dates, she also had radiofrequency ablation on March 18, 2011. So this is three months before she started working as an epic trainer. She requested from her doctor a prescription from Norco specifically because her back was hurting her. And then in May, she requested more Norco for her back. And at that point, they knew it was such a problem that they prescribed a 90-day prescription of Norco. Your time has expired. Well, thank you for your time today, and I ask that you affirm the circuit court decision affirming the admission decision. Thank you. Thank you, Counsel. Counsel, you may reply. Thanks, Judge. When we come here to present our arguments, I hope to be facing a response that's based on the record. We don't have a response that's based on the record, all the stuff she just told you that I can explain. C1170 is the point at which Dr. Levin said her progressing injury was connected to the activities she was doing either sitting or standing in her regular job activities. He didn't know she bent. He still contributed to her regular job activities at C1170. That's uncontested. That's out of her doctor's mouth. So he didn't just say she became more symptomatic. He said it's due to the job activities. The testimony about the 60% thing is absolutely wrong, too. The testimony about her asking for Norco because her back was hurting is completely false. She asked for Norco because she was going to restart exercising. I laid this out in two separate locations in the first brief where I discussed her pre-accident condition, and what we had was two shots, not four. We had a couple of ovulations. She testified she was doing fine by the time we got to trial, by the time she got into the epic part of it. So what the records show, there was no refill of Norco, no 90-day refill of Norco like she tells you in her brief. And she just told you there was no request for Norco except she was going to restart exercising. The next visit with the doctor confirms she's exercising. There's no request and no grant to make additional Norco. She rolls right into the epic shot. Dr. Popp didn't see her just one time. Dr. Popp said his time with her was onerous. It was so much out of the schedule. They included two four-hour sessions, I believe, where we got to see what she's doing for bending and everything. The supervisor admits, whether you're standing to do this job or you're sitting to do this job, you're bending for the job. The supervisor knew she was having pain while she was doing this job. There's an exchange of e-mails on two separate occasions saying, these 12-hour shifts are bad for my back, it's hurting my back. So whether it's an eight-hour shift, it's a 12-hour shift, doesn't make any difference. The issue is whether or not, mechanically, the back worsened and went to treatment for these work activities. We're not saying it just came along with nothing. It's because of the bending she was doing. The date of accident amendment is simply a housekeeping matter done by attorneys to conform proofs to the ultimate decision in the case. When a client comes in the office, you don't have a record, you don't know specifically what they're doing. You file the app, you order the records, you amend the application. If my client has signed an application for adjustment of claims for a specific traumatic event on a wrong date, I can see, okay, well maybe that is an issue because she's given us a wrong date and she's signed it. She signed out for a fictional manifestation date, a date that's a construction law. She can't commit herself to a 9-1 or a 7-something except by act of law. So that's not an issue of credibility. That is conforming the proofs with the evidence. Okay? And that's why we went to the next level. Plus, we had a doctor's testimony about that. The bending did. Okay. Well, we have to amend the app. We had a method of date of accident. Credibility. There are no specific credibility findings in the case. There's not one option of any single opinion of Dr. Levin's testimony or opinions by the commission. They just knew it didn't have anything because the commission was bending. And he brought in this authority of authoritative research which totally supported causation.  They do actually give Dr. Levin's opinion. They say, conversely, Dr. Levin opined that there was no aggravation referable to the alleged smiling from Petitioner's work in August, September of 2011. Then that would be an error in fact. That is a manifestation. Well, yeah, but you said that they have an opinion. There is an opinion. Whether it's right or wrong, it's here. Okay. Well, it's got to be honest with what's here. You're not going to find him saying that in his testimony. It was very limited because I knew he didn't have a good opinion. So I didn't go into it because I didn't want him to give good opinions. So they didn't make their proofs. So I would ask that you reconsider your position on the neutral risk doctrine. My case was denied a neutral risk. On the Adcock ruling, a neutral risk, therefore, it's automatically reversible as an error of the law. So I have to go back anyway. I would ask that you do something unusual in this case. Use the ideas of Creme Court Rule 366. Okay? Use this case as an illustration of what the Commission is supposed to be doing down there. Tell them that you don't take imaginary accidents into account in either granting or denying benefits. Excuse me. Yes. Rule 366 to do what? Well, 366 allows you, the authority, granted authority, to make the facts which should have been made from the record. Make factual, draw factual conclusions from the record which should have been made. What portion of the rule are you referring to? Did I miscite the rule? I thought it was 366, which allows you guys to draw factual conclusions. If we do that and we exercise it, we'd be going against the proposition that we owe deference to the factual decisions of the Commission. I agree. In which case, we give no deference and we decide these cases to no one. I agree. I know you've never exercised this, but I can't find any case where you have exercised this. But when the Commission is engaging in imaginary accident use to deny benefits, when they're not doing the legal standards, when the Commission says the arbitrator missed the central legal analysis, doesn't correct it, and does something else that's wrong, and they're mischaracterizing the evidence and using unverified job descriptions as probative evidence in the case, the Commission's not putting in a good effort, at least in this decision. This is a great case for illustration. Let's correct it through application of rule 366, through all the fines that should have been made, and say, hey, Commission, here's how you make a decision. Here's what you're supposed to be doing. And by the way, mutual risk may not be the risk or may not be the doctrine that we should be applying. Thank you, Counsel Cole. Thank you. The rest of your arguments in this matter will be taken under revisal. The written disposition shall issue.